# United States Court of Appeals
## For the First Circuit

No. 08-1748

ÁNGEL LUIS SANCHEZ,

Plaintiff, Appellant,

v.

MIGUEL A. PEREIRA-CASTILLO, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Leval,* and Lipez, Circuit Judges.

Guillermo Ramos-Luiña, for appellant.
Rosa E. Pérez-Agosto, with whom Maite D. Oronoz-Rodríguez, Acting Solicitor General, Ileana Oliver-Falero, Acting Deputy Solicitor General, and Leticia Casalduc-Rabell, Assistant Solicitor General, were on brief, for appellees Pereira-Castillo, et al.
Julio Nigaglioni, with whom Jennifer López Negrón was on brief, for appellee Sandra I. Deniz.

December 23, 2009

*Of the Second Circuit, sitting by designation.

**LIPEZ, Circuit Judge.** Plaintiff Ángel Sanchez alleges that, while a prisoner at a Puerto Rico correctional institution, correctional officers subjected him to an escalating series of searches of his abdominal cavity that culminated in a forced exploratory abdominal surgery. Plaintiff filed this action pursuant to 42 U.S.C. § 1983 against a group of defendants consisting of correctional officers for the Commonwealth of Puerto Rico Administration of Corrections ("AOC"), doctors who worked for the AOC, and doctors who worked at the Río Piedras Medical Center ("Río Piedras"), the medical facility where the surgery took place. His complaint alleges violations of his federal constitutional rights and raises supplemental claims under Puerto Rico law. The district court granted the defendants' motions to dismiss the suit for failure to state a claim, and plaintiff now appeals.

After review of the complaint and the district court's decision, we vacate the dismissal of plaintiff's Fourth Amendment claims against two of the correctional defendants, Miguel Cabán-Rosados and John Doe, and the doctor who performed the surgery, reinstate the supplemental claims, and remand the case for further proceedings.

## I.

We review a district court's dismissal for failure to state a claim de novo, drawing all reasonable inferences in favor of the non-moving party, Porier v. Massachusetts Dept. of

-2-

Correction, 558 F.3d 92, 94 (1st Cir. 2009), and accepting all well-pleaded facts in the complaint as true, Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008).

**A. The Complaint**

On July 13, 2006, defendant Sergeant Cabán-Rosados ("Cabán") and other correctional officers under his command conducted a search of the living quarters at the Bayamón 501 correctional institution, where plaintiff was an inmate. During the search, a handheld metal detector gave a positive finding when used to scan plaintiff and four other inmates. The men were taken to another area of the prison, where they were sniffed by law enforcement dogs who did not react in a way that would indicate the presence of contraband. The five inmates were then strip-searched, but no contraband was found. Plaintiff was again scanned with the metal detector while naked; this time, the metal detector did not indicate a positive finding.

Despite the negative findings from the dog search, the strip search, and the second metal detector search, Cabán and/or Commander Sanchez, Commander of the Guard at Bayamón 501,[1] asked an unknown doctor, identified in the complaint as Dr. Richard Roe I, to order that abdominal x-rays be taken of plaintiff and the other

---

[1] Although there are allegations against Commander Sanchez in the complaint, he is not a defendant in this case because he was not properly served. The other correctional officers whose actions are described are all defendants.

four inmates. Without examining the inmates, Dr. Roe I ordered the tests. Plaintiff objected to the x-ray, but was told that there was a judicial order for the procedure. When he asked to see the order, Cabán refused to produce one. According to the complaint, no such order existed.

After the x-rays, plaintiff was placed under the constant surveillance of two correctional officers. Cabán ordered him to have a bowel movement on the floor. Plaintiff did so, but did not expel any foreign object. Aware of that development, Cabán nonetheless ordered that the plaintiff be taken to the medical area at Bayamón 1072, where the medical director for the Bayamón Correctional Complex, identified as Dr. Richard Roe II, examined the x-ray film and told plaintiff that the x-rays revealed the existence of a foreign object in plaintiff's rectum consistent with a cellular telephone. Plaintiff denied having a cellular phone in his rectum and requested that another x-ray be taken, but his request was refused. Plaintiff later had a second bowel movement in the presence of the correctional officers, which again was free of foreign objects. After the second bowel movement, Dr. Roe II issued a referral for the Emergency Room of the Río Piedras Medical Center for further testing and/or medical intervention. Plaintiff objected, and again requested that a second abdominal x-ray be taken, but his request was denied.

Cabán and/or Sanchez coordinated plaintiff's transport to Río Piedras for the purpose of a rectal examination and/or medical procedure to remove the purported foreign object. Plaintiff was escorted to the hospital by a correctional officer identified in the complaint as John Doe. At Río Piedras, plaintiff was examined by a third doctor, identified as Dr. Richard Roe III. Dr. Roe III conducted a manual rectal examination and ordered several lab tests. The rectal examination did not reveal the presence of any foreign object, and the results of the tests were normal. Dr. Roe III then conducted a second manual rectal examination, this time in collaboration with his superior, identified in the complaint as Dr. Richard Roe IV. The second rectal examination again failed to reveal the presence of any foreign object in the plaintiff's rectum. According to the complaint, the rectal examinations were performed at the insistence of John Doe. The complaint alleged:

> At all times John Doe insisted that plaintiff was hiding a cellular phone in his rectum and pressured the medical personnel at the Emergency Room, including Dr. Richard Roe III and Dr. Richard Roe IV, to conduct a medical procedure to remove it. The pushiness exerted by John Doe followed the orders imparted by Cabán and/or Sanchez and the regulations and directives designed by Pereira, [Secretary of Corrections], as construed and implemented by all of the other Supervisory Defendants.

(Capitalization omitted.)

Despite the negative results of the two rectal examinations, Drs. Roe III and IV requested a consultation with the

-5-

surgery department of the medical center. Dr. Sandra Deniz, a surgeon, then evaluated plaintiff. She was made aware of the negative findings of the two rectal examinations, the normal results of the tests ordered by Dr. Roe III, the two bowel movements occurring after the x-ray that were free of foreign objects, plaintiff's repeated denials of having a cellular telephone in his rectum, and his repeated requests that a second x-ray be performed. Notwithstanding that knowledge, and without conducting another x-ray exam or manual test, Dr. Deniz scheduled plaintiff for emergency exploratory surgery under total anesthesia.

Before operating, Dr. Deniz obtained plaintiff's written consent. According to the complaint, plaintiff signed the consent form only under pressure from John Doe and only after Dr. Deniz promised that she would perform another rectal examination under total anesthesia before conducting the surgery. Contrary to her assurances, Dr. Deniz did not perform another rectal examination or any other less invasive procedure to confirm the presence of a foreign object before performing the surgery. Instead, while plaintiff was under total anesthesia, she immediately conducted the exploratory surgical intervention. It revealed that there was no foreign object in plaintiff's gastrointestinal tract. She then took a post-surgical x-ray, which confirmed that finding. Two days after the surgery, on July 16, plaintiff was discharged from the hospital and returned to his cell at Bayamón 501.

## B. Procedural Background

Plaintiff filed this action on July 10, 2007, alleging violations of his constitutional rights and seeking compensatory and punitive damages under 42 U.S.C. § 1983 ("Section 1983"). The complaint also contained supplemental claims under Puerto Rico law for violations of the Puerto Rico constitution and fault or negligence under Article 1802 of Puerto Rico's Civil Code. 31 L.P.R.A. § 5141.

In addition to Drs. Richard Roe I-IV, John Doe, and the defendants already mentioned by name (Cabán, Sanchez and Dr. Deniz), the complaint also named as defendants: Miguel A. Pereira-Castillo, Puerto Rico's Secretary of Corrections and Rehabilitation ("Pereira"); Hector Fontanez-Rivera, Security Director of the AOC ("Fontanez"); Ramon Díaz-Correa, Director of the Eastern Region for the AOC ("Díaz"); Gilberto Negrón-Falcón, Security Director of the Eastern Region of the AOC ("Negrón"); and Walter Soto, Superintendent of Bayamón 501 ("Soto").[2] The complaint alleged that Pereira, Fontanez, Díaz, Negrón, Soto, and Sanchez ("the administrative correctional defendants") were, inter alia, "responsible for ensuring that the correctional officers under their command followed practices and procedures [that] would respect the rights and ensure the bodily integrity of Plaintiff .

---

[2] The spouses of all married defendants, as well as their conjugal partnerships, were also named in the complaint. We will omit reference to these parties in our discussion.

. . [t]his they failed to do with deliberate indifference and/or in reckless disregard of Plaintiff's federally protected rights . . . ."

Correctional defendants Pereira-Castillo, Fontanez-Rivera, Díaz-Correa, Negrón-Falcón, Soto-Hernandez and Cabán moved to dismiss the complaint for failure to state a claim for relief. See Fed. R. Civ. P. 12(b)(6). The motion also stated that the claims against Pereira, Fontanez, Díaz, Negrón, and Soto should be dismissed because respondeat superior liability claims are not cognizable under Section 1983 and that, in any case, all of the correctional defendants were entitled to qualified immunity on all claims.

Dr. Deniz also filed a motion to dismiss, claiming that plaintiff's constitutional rights were not violated by the medical procedure and that plaintiff was limited to traditional tort remedies for medical malpractice. She did not contest that she was a state actor for purposes of a Section 1983 claim, but argued that she was entitled to Eleventh Amendment immunity in her official capacity and qualified immunity in her personal capacity.

## C. The Dismissal of Plaintiff's Complaint

The district court granted the defendants' motions to dismiss. Sanchez v. Pereira-Castillo, 573 F. Supp. 2d 474 (D.P.R. 2008). The court first determined that because the suit was brought against the defendants in their personal capacity,

sovereign immunity did not apply. Id. at 483. The court then considered plaintiff's claims that the strip searches, x-rays, and rectal examinations violated his rights under the Fourth Amendment.[3] The court concluded that the searches were reasonable and did not violate the Fourth Amendment.

The court took pause, however, at the exploratory surgery, noting that "[t]here can be no doubt that the surgery performed on Plaintiff posed a risk to his physical well being." Id. at 486-87. Nonetheless, the court found that:

> The AOC's personnel did not decide or give the order to perform the rectal exams and the surgery on Plaintiff. The decision to perform the rectal exams was made by the staff at the Medical Center. Furthermore, the decision to go ahead with the exploratory surgery was [made] by Deniz.

Id. at 487. Therefore, the court found that plaintiff had failed to state a claim for deprivation of his constitutional rights by the correctional defendants with respect to the abdominal surgery. Id. According to the district court, "[a] holding to the contrary would place the AOC's official in the impossible position of having to second guess the medical staff's decision." Id. (citing Sullivan v. Bornemann, 384 F.3d 372, 377 (7th Cir. 2004)).

Although Dr. Deniz had not argued in her motion to dismiss that she was not a state actor, the court concluded that

---

[3] The court found that plaintiff's Fifth Amendment claims should be dismissed because that amendment "applies only to actions of the federal government . . . ." Id. at 484.

-9-

she was not and dismissed plaintiff's Fourth Amendment claim against her on that basis, writing that "Deniz was acting as a doctor when she performed the exploratory surgery and not as an official under color of law." Id. at 488. "Thus," the court concluded, "Deniz did not violate Plaintiff's Constitutional rights." Id.

Having concluded that plaintiff's complaint did not state a claim that his constitutional rights were violated by the x-ray, the strip search, the rectal examinations, or the exploratory surgery, the district court concluded that there was no need to examine further the issue of qualified immunity. Id. Finally, having dismissed plaintiff's federal law claims, the court declined to exercise supplemental jurisdiction over the Puerto Rico law claims. Id. at 490 (citing Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998)).

After the district court issued its opinion, plaintiff moved for reconsideration and leave to file an amended complaint. Plaintiff argued that the district court had effectively ordered the dismissal sua sponte by basing its decision on a case, Sullivan, 384 F.3d 372, that was not cited by either party. In a written memorandum and order, the district court disagreed with plaintiff's characterization of the order as a sua sponte dismissal, and denied his requests for reconsideration and to file an amended complaint. Sanchez, 573 F. Supp. 2d at 491-92.

-10-

This appeal followed.

## II.

As a preliminary matter, we discuss plaintiff's argument that the district court's dismissal of his complaint under Rule 12(b)(6) deprived him of notice and an opportunity to be heard because the court based its decision on grounds different from those argued by the defendants and did not give the plaintiff prior warning or the chance to rebut those arguments that ultimately swayed the court. Plaintiff points out, correctly, that sua sponte dismissals are discouraged in this circuit; we have cautioned that they are "strong medicine, and should be dispensed sparingly." Gonzalez-Gonzalez v. United States, 257 F.3d 31, 33 (1st Cir. 2001). Because of notice and fairness issues raised by such dismissals, we have also stated that they "are erroneous unless the parties have been afforded notice and an opportunity to amend the complaint or otherwise respond." Futura Dev. of P.R., Inc., v. Estado Libre Asociado de P.R., 144 F.3d 7, 14 (1st Cir. 1998). Plaintiff sought to amend his complaint after the district court issued its order, but his motion was denied.

We disagree, however, with plaintiff's assessment that the district court's dismissal occurred sua sponte. The court acted in response to defendants' motions to dismiss under Rule 12(b)(6). As we indicated in Cordero-Hernández v. Hernández-Ballesteros, 449 F.3d 240, 243 n.2 (1st Cir. 2006), a dismissal is

-11-

not sua sponte when it responds to a motion to dismiss. See id. ("[T]here is some difference between dismissal of a claim that has never been challenged and dismissal where, as here, the court acts in response to a defendant's motion but on grounds not fully briefed by the movant.") (citation omitted). Nonetheless, we cautioned in that case that "if the district court had any doubt that plaintiffs understood that they were in danger of having their complaint dismissed on grounds they had not had an opportunity to argue, the safest course would have been to give notice of the proposed grounds for dismissal and to take arguments on the question." Id. The district court would have done well to follow that advice here. Allowing plaintiff to contest the district court's comparison of this case to Sullivan may have illuminated the ways in which it is inapposite, which we will discuss infra, and therefore may have prevented the court's erroneous reliance on that case.

## III.

Section 1983 "creates a remedy for violations of federal rights committed by persons acting under color of state law." Haywood v. Drown, 129 S. Ct. 2108, 2111 (2009). Although prisoners experience a reduction in many privileges and rights, a prisoner "'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Turner v. Safley, 482 U.S.

78, 95 (1987) (modification in original) (quoting Pell v. Procunier, 471 U.S. 817, 822 (1974)).

We review the grant of a motion to dismiss de novo. Like the district court, we are required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff[]." Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001); Trans-Spec Truck Svc., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). In order to survive a motion to dismiss, plaintiff must allege sufficient facts to show that he has a plausible entitlement to relief. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Section 1983 requires three elements for liability: deprivation of a right, a causal connection between the actor and the deprivation, and state action. 42 U.S.C. § 1983. State actors may be immune from suit on the basis of qualified immunity.

Accordingly, we will first discuss plaintiff's claim that he was deprived of his Fourth Amendment rights, analyzing whether the searches at issue implicated and violated that amendment. Because we find that the allegations do charge a Fourth Amendment violation, we will then assess whether plaintiff has sufficiently stated claims that each individual defendant was a cause of the violation. Next, we will assess whether Dr. Deniz qualifies as a state actor for purposes of this action. Finally, we will discuss

-13-

whether any remaining correctional defendants and Dr. Deniz are entitled to qualified immunity on the Fourth Amendment claims.

**A. The Fourth Amendment Claim**

> 1. Were the Procedures Performed at the Medical Center "Searches" Within the Scope of the Fourth Amendment?

To determine whether the rectal examinations and the exploratory surgery implicated the Fourth Amendment, we must first determine whether they constituted searches for evidence or legitimate medical procedures.[4] As will be discussed further below, it is impossible to reconcile the allegations in the complaint with the district court's conclusion that these procedures were "medical decisions made exclusively by physicians." According to the complaint, the procedures were carried out at the insistence of correctional officials for the purpose of finding a cell phone in plaintiff's rectum.

The procedures were the direct culmination of a series of searches that began when a metal detector used to scan plaintiff's person gave a positive reading. The complaint describes the

---

[4] Although plaintiff's complaint alleges several searches, including strip and x-ray searches, he only argues on appeal that the rectal examinations and the exploratory surgery violated his constitutional rights. Accordingly, we affirm the dismissal of plaintiff's claims that the strip and x-ray searches violated his rights. United States v. Soler, 275 F.3d 146, 155 n.5 (1st Cir. 2002) (arguments not developed on appeal are waived). Also, we affirm the dismissal of all claims against Drs. Roe I and II, as the complaint contains no allegations that those doctors were involved in the rectal examinations or the exploratory surgery.

-14-

surgery as "medically unnecessary," and explains circumstances supporting that claim, namely that plaintiff had two normal bowel movements before the searches were conducted, that Dr. Roe III examined him upon arrival at the hospital and found him to be asymptomatic, and that several lab tests ordered by Dr. Roe III were found to be "within normal limits." Because the procedures described in the complaint were searches for evidence, they are properly analyzed under the framework of the Fourth Amendment.

2. Did the Searches Violate the Fourth Amendment?

"The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy' that has been invaded by government action.'" Hudson v. Palmer, 468 U.S. 517, 525 (1984) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979) (other quotation marks omitted)). In the prison context, prisoners are "accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Id. at 523. We have recognized that a limited right of bodily privacy against searches is not incompatible with incarceration. Cookish v. Powell, 945 F.2d 441, 446 (1st Cir. 1991) (per curiam) ("[S]ome Fourth Amendment protection [i]s available to inmates as to their persons.").[5] A

_____

[5] Although the Supreme Court in Hudson "foreclosed any [F]ourth [A]mendment challenge to the search of a prison cell," this court, like those in most other circuits, "has recognized a qualitative difference between property searches and searches of a

-15-

reviewing court must "'balanc[e] the need for the particular search against the invasion of personal rights that the search entails.'" Id. (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).  Mindful of this principle, we analyze the rectal exams and the surgery separately, concluding that the rectal exams did not violate plaintiff's Fourth Amendment rights, but the surgery did.

a. The Rectal Examinations

Plaintiff argues that the two rectal examinations conducted at the hospital violated his Fourth Amendment rights. When analyzing searches of prisoners' body cavities, we ask whether the search was "'reasonable' under the circumstances."  Arruda v.

---

prisoner's person." Dunn v. White, 880 F.2d 1188, 1191 (10th Cir. 1989); see Bonitz v. Fair, 804 F.2d 164, 170 n.6 (1st Cir. 1986) (overruled on other grounds by Unwin v. Campbell, 863 F.2d 124 (1st Cir. 1988) (noting that after Hudson, "plaintiffs can no longer claim that their cells or other parts of the prison were unreasonably searched," while analyzing strip searches of prisoners under Bell v. Wolfish, 441 U.S. 520, 545 (1979)); see also Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992) (despite Hudson, "inmates do retain a limited right to bodily privacy"); Canedy v. Boardman, 16 F.3d 183, 185-86 (7th Cir. 1994) (Hudson's abrogation of Fourth Amendment rights limited to prisoner's cells; Wolfish governs searches of prisoners' bodies); Cornwell v. Dahlberg, 963 F.2d 912, 916 (6th Cir. 1992) ("[T]his Circuit has joined others in recognizing that a convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners."); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997) (rejecting as dicta suggestion that the Court in Hudson "intended to strip the inmates of all Fourth Amendment privacy rights"); Elliott v. Lynn, 38 F.3d 188, 191 n.3 (5th Cir. 1994) (holding that inmates' Fourth Amendment protection from unreasonable body cavity searches survives Hudson); but see Johnson v. Phelan, 69 F.3d 144, 150 (7th Cir. 1995), cert. denied, 519 U.S. 1006 (1996) (holding that, after Hudson, "the [F]ourth [A]mendment does not protect privacy interests within prisons").

-16-

Fair, 710 F.2d 886, 887 (1st Cir. 1983) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).  The reasonableness of a search, in turn, depends on the "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Wolfish, 441 U.S. at 559.  A court must "evaluate 'prison practice . . . in light of the central objective of prison administration, safeguarding institutional security.'" Arruda, 710 F.2d at 887 (quoting Wolfish, 441 U.S. at 547).  In each case, the "need for the particular search must be balanced against the invasion of personal rights that the search entails." Id. at 889 (Maletz, J., concurring in part and dissenting in part).

Unlike in Wolfish, where the searches at issue were purely visual, the searches in this case involved touching and intrusion, a distinction that "is significant and has been noted by courts." Bonitz, 804 F.2d at 172.  The Wolfish framework, however, still guides the inquiry.  See Del Raine v. Williford, 32 F.3d 1024, 1040 (7th Cir. 1994); Bonitz, 804 F.2d at 170.

There is no doubt that digital rectal examinations entail an intrusion greater than the "severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities." Bonitz, 804 F.2d at 172 (quotation omitted).  At a minimum, they are "highly intrusive and humiliating." Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir.

-17-

1988).  Nevertheless, physical rectal examinations of prisoners, when carried out by trained medical staff under sanitary conditions, are at times "a necessary and reasonable concomitance of . . . imprisonment."  Daughtery v. Harris, 476 F.2d 292, 295 (10th Cir. 1973).

In this case, the "manner" and "place in which [the search was] conducted" weigh in favor of a finding of reasonableness.  Wolfish, 441 U.S. at 559.  The rectal searches of plaintiff's person were conducted by medical professionals in the professional, hygienic confines of a hospital.  In reviewing the reasonableness of body-cavity searches, courts have stressed that they were conducted in a private area and in a hygienic manner.  Bonitz, 804 F.2d at 172; contrast id. at 173 (finding that "a body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from an unreasonable search").  The complaint describes no abusive or otherwise unprofessional conduct on the part of the correctional officers or the doctors during the rectal exams, nor does it set forth any facts to suggest that the rectal examinations of plaintiff's person by medical professionals were more intrusive than similar exams carried out as a matter of policy by paraprofessionals at other prisons.  See Daughtery, 476 F.2d at 294 (prison "policy of

-18-

allowing rectal searches [by trained paraprofessional medical assistants in a designated area] must be considered reasonable unless contradicted by a showing of wanton conduct").

As for the "justification" for the search, Wolfish, 441 U.S. at 559, the complaint describes a search carried out for the legitimate penological objective of locating and removing contraband from the prison system. See id. at 559. The Supreme Court has advised us to be careful not to impose our own judgments about the security needs of prison administrators. Turner v. Safley, 482 U.S. 78, 89 (1987) ("'[P]rison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'") (modifications in original) (quoting Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 128 (1977)). "Wolfish cautions us to be most hesitant to overturn prison administrators' good faith judgments" about "the relative security needs of institutions." Arruda, 710 F.2d at 887. Plaintiff does not argue that the digital rectal searches were not related to a legitimate penological need, nor does he describe any circumstances surrounding the examinations that would make the searches appear abusive. Cf. Wolfish, 441 U.S. at 560 (noting that visual searches of body cavities conducted in an abusive fashion "cannot be condoned"); see also Bonitz, 804 F.2d at 172-73 (abusive rectal searches were unconstitutional); Tribble v. Gardner, 860 F.2d 321, 325 (9th Cir. 1988) (complaint described unconstitutional

rectal searches when it alleged that they were abusive and not related to a penological need).

In Daughtery, 476 F.2d at 295, the Tenth Circuit found it constitutional for a correctional institution to require routine rectal examinations of all prisoners prior to court appearances. The searches were conducted according to prison directives, "carried out by trained paraprofessional medical assistants in a designated area and under sanitary conditions," and "there was no attempt on the part of officials or medical personnel to humiliate or degrade" the prisoners. Id. We conclude that the rectal searches of plaintiff described in the complaint, carried out by medical professionals in the relatively private, sanitary environment of a hospital, upon suspicion that plaintiff had contraband in his rectum, and with no abusive or humiliating conduct on the part of the law enforcement officers or the doctors, were not unreasonable.[6]

b. The Surgery

Plaintiff also alleges that the exploratory surgery of his abdomen as described in his complaint violated his rights under the Fourth Amendment. We agree. The complaint states that he was

---

[6]    Having found that the rectal examinations did not violate the Fourth Amendment, we find that the Fourth Amendment claims against Drs. Roe III and IV were appropriately dismissed. Drs. Roe III and IV's only involvement in the surgical procedure was "plac[ing] a consultation to the Surgery Department" at the insistence of John Doe. Thus, according to the complaint, they did not encourage or participate in the surgery.

-20-

forced to undergo dangerous, painful, and extremely intrusive abdominal surgery for the purpose of finding a contraband telephone allegedly concealed in his intestines, even though the basis for believing there was a telephone was slight, several tests had indicated the absence of any such object, and additional, far less intrusive testing could easily have obviated any need for such grievous intrusion. Prisoners do have protection from unreasonable searches of their persons, Cookish, 945 F.2d at 446, and the surgery described in the complaint was just such an unreasonable, unconstitutional search.

The most disturbing element of the exploratory surgery is unquestionably its "scope." Wolfish, 441 U.S. at 559. In Winston v. Lee, 470 U.S. 753 (1985), the Supreme Court decided that the state of Virginia could not compel a criminal suspect to undergo a surgical procedure to remove a bullet lodged in his chest, although the bullet would be helpful to the state in prosecuting the suspect for an attempted robbery. Id. at 756. The Court explained that:

> The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers. . . . Notwithstanding the existence of probable cause, a search for

-21-

> evidence of a crime may be unjustifiable if it endangers the life or health of the suspect.

Id. at 760-61. To be sure, the situation here involves the search of a prisoner, whereas Winston involved the search of a "citizen -- not yet convicted of a criminal offense." Winston, 470 U.S. at 765 (quotation omitted). Plainly, the same Fourth Amendment standards do not apply to prisoners as they do to free citizens. See, e.g., Hudson, 468 U.S. at 524; Wolfish, 441 U.S. 520 (upholding visual body cavity searches based on less than probable cause). We therefore analyze this case under the rubric of Wolfish, which sets forth a balancing test designed to take into account the special circumstances of the prison context. Nonetheless, the Supreme Court's precedent on compelled surgical invasion is unquestionably relevant to our analysis of the scope of the surgery in question here.

In Winston, the Court distinguished the earlier case of Schmerber v. California, 384 U.S. 757 (1966), where it had ruled that a suspect's Fourth Amendment rights were not violated by the extraction of his blood by a medical doctor, at the behest of a police officer, in order to determine his blood alcohol content. Id. at 758, 773. The blood draw procedure at issue in Schmerber was "commonplace . . . and experience with [it] teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." Id. at 771.

-22-

Other important factors in Schmerber were "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" and "the community's interest in fairly and accurately determining guilt or innocence." Winston, 470 U.S. at 761-62. Balancing those factors, the Court ruled that the blood draw was not unreasonable. Schmerber, 384 U.S. at 772.

Here, in contrast to the blood-draw procedure in Schmerber, the forced abdominal surgery was not "commonplace" and did involve "risk, trauma, [and] pain." Schmerber, 384 U.S. at 771. Unlike a simple blood draw, plaintiff's surgery was unusual and required total anesthesia, surgical invasion of the abdominal cavity, and two days of recovery in the hospital. The complaint alleges that he was "slashed and mutilated" during the procedure, that his "life and health were jeopardized," and that he experienced "severe physical and emotional pain that continues at present."

Adding to the egregious "scope" of the forced surgery was the lack of "justification" for the procedure. Wolfish, 441 U.S. at 559. The surgery was conducted despite several indications of the absence of contraband, including the results of two monitored bowel movements and two rectal examinations. An x-ray -- a much simpler, less invasive procedure -- could have confirmed those results (and eventually did). We recognize that the Supreme Court has cautioned that the "logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the

-23-

exercise of virtually all search-and-seizure powers." Wolfish, 441 U.S. at 559 n.40 (quotation marks omitted).[7] In this case, however, given the dramatically invasive circumstances, we conclude that it is appropriate to consider that this surgery, according to the complaint, could have been avoided with a simple x-ray.

Unlike the district court, we do not find that plaintiff's signed consent form eliminates the Fourth Amendment concerns raised by the surgery. See Sanchez, 573 F. Supp. 2d at 488 ("Plaintiff's Fourteenth Amendment claim is not the appropriate manner of challenging the acts committed by Deniz, especially [] when the exploratory surgery was performed after obtaining Plaintiff's consent."). We reiterate that the district court was obligated, as are we, to accept the well-pleaded facts in the complaint as true. The complaint states that:

> Plaintiff executed said consent form only after his repeated requests for other radiographic tests were rebuffed and after Dr.

---

[7] The Supreme Court has acknowledged, however, that the existence of less intrusive alternatives may be relevant to the determination of the reasonableness of a particular search method. See Wolfish, 441 U.S. at 559 n.40 (discussing, on the assumption that such arguments would be relevant, the merits of various less-restrictive-alternative arguments). In the context of prisoners' First Amendment rights, the Court has explained that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner v. Safley, 482 U.S. 78, 90 (1987). While making clear that it was not creating a "least restrictive alternative test," the Court held that "if an inmate can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 90-91 (internal citation omitted).

> Sandra Deniz assured him that she was going to perform a rectal examination under total anesthesia before taking any additional measures. Plaintiff was also intimidated by the insistence and pressure exerted by John Doe upon all of the physicians that examined him at the Rio Piedras Medical Center as previously described.

Plaintiff was a prisoner who had been under constant surveillance for more than a day prior to the surgery, and had been forced to submit to searches, x-rays, and invasive rectal examinations prior to his signing the consent form. He had twice been forced to excrete on a floor in the presence of prison personnel. In light of these intimidating circumstances, plaintiff's claim that he was pressured and intimidated into signing the consent form is plausible.

Plaintiff's complaint also states that he was falsely assured by Dr. Deniz that before operating she would perform another rectal examination under anesthesia. He gave his consent, such as it was, to an invasive surgery to be performed only after the doctor herself conducted an additional rectal exam, not to the surgery as it was conducted. We therefore find that the consent form does not preclude plaintiff's claim that he was deprived of his Fourth Amendment rights. See United States v. Vanvliet, 542 F.3d 259, 264 n.2, 264-65 (1st Cir. 2008) (noting that totality of circumstances test for determining voluntariness of consent to a search includes "the length and conditions of the consenter's detention and/or questioning," "law enforcement officials' use of any inherently

coercive tactics," "evidence of police coercion or intimidation," and "consideration of any evidence that law enforcement officers' fraud, deceit, trickery or misrepresentation prompted defendant's acquiescence to the search").

The correctional defendants offer one argument in support of the constitutionality of this search:

> In light of the policy concerns manifested in Sullivan, it must be concluded that, regardless of the purpose of the surgical or other type of intervention, medical or investigative, any type of intervention performed at a medical facility is solely . . . influenced by the knowledge of those adequately trained in the field, not any one John Doe.

(Emphasis added.) That argument falters in light of the Supreme Court's precedent. When a medical procedure is performed at the instigation of law enforcement for the purpose of obtaining evidence, the fact that the search is executed by a medical professional does not insulate it from Fourth Amendment scrutiny. See Winston, 470 U.S. at 763-64, 766 (surgery to be performed by medical doctor for the purpose of retrieving evidence of an attempted robbery would be unreasonable under the Fourth Amendment); Schmerber, 384 U.S. at 767 ("It could not reasonably be argued . . . that the administration of the blood test [by a physician at the request of a police officer] . . . was free of the constraints of the Fourth Amendment."); Rodriques v. Furtado, 950 F.2d 805, 814 (1st Cir. 1991).

-26-

Sullivan v. Bornemann, 384 F.3d 372 (7th Cir. 2004), relied on by the district court and by the defendants on appeal, does not contradict this Supreme Court precedent, and is not inconsistent with our holding that the complaint describes an unreasonable search. Sullivan dealt with a medically-necessary procedure, not a search for evidence. There the plaintiff alleged that police officers had violated his constitutional rights when they assisted a nurse by restraining him during a catheterization procedure conducted during a pre-lockup medical evaluation. Id. at 373-74. The plaintiff's high blood alcohol content, erratic behavior, high blood pressure, and inability to provide a urine sample prompted the treating physician to order the catheterization to obtain a urine sample. Id. When the plaintiff would not be still, the nurse responsible for the catheterization asked the defendant officers to help restrain the plaintiff, explaining that his "ability for movement had to be restricted to minimize the risk of injury and infection during the brief procedure." Id. at 374. The officers did not offer "any opinions or suggestions about Sullivan's medical care" and "played no role" in the decision to order a catheterization. Id. Moreover, one of the defendant officers "specifically informed Sullivan that the urine sample would not be used for criminal prosecution or other evidentiary purposes." Id.

Even the Sullivan court was careful to point out that its opinion should not be read broadly to cover a situation such as the instant case. The court wrote:

> It is undisputed that [the defendant officers] had no input into Sullivan's medical care once he arrived in the emergency room. In addition, Sullivan has not argued that the catheterization was used to search for evidence determining his guilt or innocence. It is uncontested that the catheterization was performed solely to assure Sullivan's medical well-being before he was transported to the county jail. We express no opinion on how, if at all, a difference in any of these circumstances would affect the analysis.

Sullivan, 384 F.3d at 376. Sullivan, therefore, is inapposite to this case, where plaintiff alleges that the surgery was carried out at the insistence of AOC staff for the law enforcement purpose of determining whether plaintiff had a foreign object in his rectum.

Viewing the plaintiff's well-pleaded factual allegations as true, we conclude that "society is prepared to recognize" that a prisoner has a reasonable expectation that he will not be forced to undergo abdominal surgery for the purpose of finding contraband, at least in these circumstances. Hudson, 468 U.S. at 525. Plaintiff was surgically invaded for the purpose of searching for a cell phone when other, less-invasive means had already indicated the absence of such an object. Unlike in Winston, there is serious doubt whether the surgery was even "likely to produce evidence of a crime," 470 U.S. at 759, and by far less drastic measures the

-28-

existence of the telephone could easily have been excluded.  The surgery was a severe "intrusion upon [plaintiff's] dignitary interests in personal privacy and bodily integrity," Winston, 470 U.S. at 762.  We conclude that the allegations in the complaint describe an unreasonable search conducted under the color of state law.[8]

## B. Causation

In response to a motion to dismiss, we must determine whether, as to each defendant, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.  See Fed. Rule Civ. Proc. 12(b)(6).  Plaintiff has alleged facts which, if proved, would amount to a violation of his Fourth Amendment rights.  Our inquiry now centers on the sufficiency of his claims that the various defendants in this action caused that violation. In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  In other words, a plaintiff must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," id., in

---

[8] Plaintiff's complaint also raises due process and Eighth Amendment claims that were dismissed by the district court. Because plaintiff has developed no argument on his Eighth and Fourteenth Amendment claims, those claims are waived. Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) ("It is settled in this circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned.").

order to claim "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-6 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 555 (2007)).

Our task in determining whether the facts alleged are sufficient to state a plausible claim against a particular defendant is "context-specific." Iqbal, 129 S.Ct. at 1950; see also id. at 1952 ("Unlike in Twombly, where the doctrine of respondeat superior could bind the corporate defendant, here [Iqbal required proof of intentional discrimination] . . . petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). We must draw on our "judicial experience and common sense" as we make a contextual judgment about the sufficiency of the pleadings. Id. at 1950.

We find that plaintiff's claims against Cabán, John Doe, and Dr. Deniz have "facial plausibility," id. at 1949, while those against the administrative correctional defendants do not. Because our analysis varies depending upon the nature of the claim against a defendant, we group our treatment of plaintiff's claims by defendant. We begin with the administrative correctional defendants. We then analyze the claims against Cabán and John Doe.

1. The Administrative Correctional Defendants

We read plaintiff's complaint to assert a claim of supervisory liability under Section 1983 against the administrative correctional defendants, namely Pereira, Fontanez, Díaz, Negrón, and Soto, premised on the theory that those defendants failed adequately

to train the correctional defendants who were implicated in the surgery itself. Although "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior," Iqbal, 129 S. Ct. at 1948, supervisory officials may be liable on the basis of their own acts or omissions. Aponte-Matos v. Toledo-Dávila, 135 F.3d 182, 192 (1st Cir. 1998). In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights-violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999). In the latter scenario, relevant here, the analysis focuses on "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." Id. In either case, the plaintiff in a Section 1983 action must show "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization," id., between the actor and the underlying violation.

In determining whether allegations state a plausible claim for relief, the Supreme Court has suggested that we "begin by identifying pleadings that, because they are no more than

-31-

conclusions, are not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1950.  Turning to plaintiff's complaint, we find that it does little more than assert a legal conclusion about the involvement of the administrative correctional defendants in the underlying constitutional violation.  Parroting our standard for supervisory liability in the context of Section 1983, the complaint alleges that the administrative defendants were "responsible for ensuring that the correctional officers under their command followed practices and procedures [that] would respect the rights and ensure the bodily integrity of Plaintiff" and that "they failed to do [so] with deliberate indifference and/or reckless disregard of Plaintiff's federally protected rights."  This is precisely the type of "the-defendant-unlawfully-harmed-me" allegation that the Supreme Court has determined should not be given credence when standing alone.  Id. at 1949.

The sole additional reference to the administrative correctional defendants' role in the surgery is the complaint's statement that "[t]he pushiness exerted by John Doe [upon the doctors] followed . . . the regulations and directives designed by Pereira and construed and implemented by all of the other Supervisory Defendants."[9]  However, the only regulations described

---

[9]     The complaint contains more specific factual allegations about the administrative correctional defendant's supervisory responsibility for the strip and x-ray searches. Specifically, the complaint alleges that Secretary Pereira, in particular, was responsible for the strip search and x-ray policy that led to the strip search and x-rays at issue in this case and that "he failed

-32-

in the complaint are the strip search and x-ray regulations promulgated by Pereira. The deliberate indifference required to establish a supervisory liability/failure to train claim cannot plausibly be inferred from the mere existence of a poorly-implemented strip search or x-ray policy and a bald assertion that the surgery somehow resulted from those policies. We conclude, therefore, that the "complaint has alleged - but it has not 'show[n]' -'that the pleader is entitled to relief'" from the administrative correctional defendants. Iqbal, 129 S.Ct. at 1950 (quoting Fed. Rule Civ. Proc. 8(a)(2)). Although it did so on different grounds, the district court was correct to dismiss the claims against those defendants.

2. Sergeant Cabán and John Doe

We conclude that plaintiff's allegations against Cabán and John Doe are sufficient to allow us "to draw the reasonable inference that [each] defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. Although the claims against John Doe and Cabán also rest on a form of supervisory liability in the sense that neither one actually performed the surgery on plaintiff, those claims do not depend on a showing by plaintiff of a failure to train amounting to deliberate indifference to his

_____

to adequately train AOC personnel . . . regarding those special types of searches" and was aware of the lack of proper training. Because we find there to be no underlying constitutional violation arising from the strip and x-ray searches of plaintiff, the claims of supervisory liability arising from those searches must fail.

constitutional rights. Instead, plaintiff succeeds in pleading that the defendants were liable as "primary violator[s] . . . in the rights-violating incident," thereby stating a sufficient claim for relief. Camilo-Robles, 175 F.3d at 44.

We begin with the claims against Sergeant Cabán.[10] Plaintiff's complaint specifically alleges that Cabán was directly involved in all phases of the search for contraband,[11] and in the ultimate decision to transport plaintiff to the hospital "for a rectal examination and/or a medical procedure to remove the foreign object purportedly lodged in Plaintiff's rectum." The complaint goes on to allege that John Doe, acting pursuant to "orders imparted by Cabán," pressured the doctors to conduct a medical procedure to remove the illusory cell phone from plaintiff's bowels. Given these allegations, it is a plausible inference that Cabán caused plaintiff to be subjected to the deprivation of his Fourth Amendment rights. See 42 U.S.C. § 1983.

---

[10] For clarity, we have excised references to Commander Sanchez from the language we quote from the complaint. We have also omitted block capitalization and other confusing stylistic elements.

[11] The complaint states that "Cabán and numerous correctional officers under his direct command" conducted a search of the living quarters at Bayamón 501 which involved scanning plaintiff and other inmates with a handheld metal detector. The complaint goes on to allege that "Cabán ordered that [plaintiff] be transported to Bayamón 308 where x-rays would be taken to confirm or rule out the presence of possible contraband within [his] body cavity." The complaint alleges that "[a]t the request of Cabán," x-rays of plaintiff were taken. The complaint states, further, that "pursuant to Cabán's orders, plaintiff forced himself to have a bowel movement on the floor."

We employ common law tort principles when conducting "inquiries into causation under § 1983." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989). The language of Section 1983 demands as much. The statute imposes liability upon those who "subject[] or cause[] to be subjected" any citizen to a deprivation of a constitutional right. 42 U.S.C. § 1983. We have explained that the causal connection alluded to by the statute "can be established not only by some kind of [] personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Gutierrez-Rodriguez, 882 F.2d at 561 (quotation marks omitted). Put another way, an actor is "responsible for 'those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'" Id. (quoting Springer v. Seaman, 821 F.2d 871, 876 (1st Cir. 1987)). We read plaintiff's complaint to state that Cabán affirmatively set in motion the trip to the hospital for the purpose of removing the alleged contraband from within plaintiff's body, with a resort by medical professionals to whatever procedure was required to achieve that goal. In that sense, Cabán is a "primary violator . . . in the rights-violating incident." Camilo-Robles, 175 F.3d at 44.

Plaintiff's allegations against John Doe also survive the motion to dismiss. The complaint alleges that plaintiff arrived at the hospital emergency room "accompanied by John Doe." The

-35-

complaint further states that "[a]t all times John Doe insisted that plaintiff was hiding a cellular phone in his rectum and pressured the medical personnel at the emergency room . . . to conduct a medical procedure to remove it." Thus, the complaint charges John Doe with affirmatively causing the violation of plaintiff's rights by insisting at the hospital that the doctors perform a medical procedure to remove the suspected contraband from his stomach. Like Cabán, he is alleged to be a primary violator of plaintiff's Fourth Amendment rights.

We must reverse the district court's dismissal of the claims against John Doe and Cabán.

## C. State Action[12]

The district court dismissed plaintiff's Fourth Amendment claim against Dr. Deniz because it concluded that Dr. Deniz was not acting under color of law when she performed the surgery. Sanchez, 573 F. Supp. 2d at 488. We disagree. Plaintiff has adequately stated a claim that Dr. Deniz was acting under color of law when she performed the surgery.[13]

---

[12] It is undisputed that all correctional defendants were state actors.

[13] Plaintiff failed to respond to Dr. Deniz's motion to dismiss, and explains that failure on appeal by stating that he had already responded to the correctional defendants' similar motion and his arguments would have been the same. The district court, however, did not base its dismissal on that procedural lapse and instead relied on the merits of the case. Dr. Deniz does not argue in her brief on appeal that this would be an alternative basis to affirm the motion to dismiss. Therefore, we do not consider the effect of plaintiff's failure to respond to Dr. Deniz's motion to

Assuming that Dr. Deniz is a private actor,[14] her actions must be "fairly attributable to the State" in order for her to have acted under color of state law. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1987). "In other words, it must be fair to characterize" her as a state actor. Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005). We have employed three tests to determine "whether a private party fairly can be characterized as a state actor: the state compulsion test, the nexus/joint action test, and the public function test." Id. at 5. Plaintiff alleges that state action exists in this case under the compulsion test because Dr. Deniz was strongly encouraged by the correctional defendants to perform the surgery. "Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.'" Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004

---

dismiss.

    [14]  Plaintiff averred in his complaint that Río Piedras is a publicly owned and operated facility and that, as such, Dr. Deniz was acting as an employee of Puerto Rico. In Lugar, the Supreme Court said that "[s]tate employment is generally sufficient to render the defendant a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 935 n.18 (1987); see also Downs v. Sawtelle, 574 F.2d 1, 10 (1st Cir. 1978) (noting that agents and employees of state hospitals may be sued under Section 1983). The district court did not discuss this potential basis for a finding of state action, nor do the parties discuss it in their briefs. This seems a curious omission by all concerned. Nevertheless, the omission precludes us from addressing the issue.

(1982)).  Plaintiff's complaint, which describes "the insistence and pressure exerted by John Doe upon all of the physicians that examined him at the Rio Piedras Medical Center," sufficiently alleges facts that meet the state compulsion test.

In Rodriques v. Furtado, 950 F.2d 805, 814 (1st Cir. 1991), we determined that a private doctor was a state actor when he was conscripted by the police to conduct a search of a suspect's vagina pursuant to a warrant.

> The scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant. Dr. Falkoff's role in the search was purely that of an auxiliary to normal police search procedures. He exercised the power of search traditionally reserved exclusively to the State, because of the 'coercive power' and 'significant encouragement' represented by the search warrant.

Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)) (internal citations omitted).  That rationale is equally, if not more, apt here.

D. **Qualified Immunity**

The defendants pressed a defense of qualified immunity in their motions to dismiss.  Because the district court concluded that the allegations in the complaint did not describe the violation of a constitutional right, it concluded that it did not have to address the other aspects of the qualified immunity defense.  Having concluded that the allegations in the complaint do

-38-

describe the violation of a constitutional right, we consider the other elements of the qualified immunity defense even though defendants foolishly failed to argue them. We do so because we can affirm a decision "on any basis available in the record." Pequero-Moronta v. Santiago, 464 F.3d 29, 34 (1st Cir. 2006). We also seek to avoid the piecemeal litigation that might result if the complaint were dismissed after remand on the basis of the other prongs of the qualified immunity defense.[15]

We apply a two-part test to determine whether qualified immunity shields a government official from liability. Maldonado v. Fontanes, 568 F.3d 263, 268-69 (1st Cir. 2009). At the motion to dismiss stage, we consider: 1) whether plaintiff's allegations, taken as true, establish the violation of a constitutional right, and 2) whether the constitutional right was clearly established at the time of the challenged conduct. Id. at 269. The second step of this analysis has two components. Id. It requires us to consider both whether the contours of the constitutional right were sufficiently clear at the time of the alleged conduct and also whether, under the particular facts of the case, a reasonable officer would have understood that his behavior violated that

---

[15] Our conclusions on qualified immunity based on the allegations in the complaint do not preclude the defendants from raising this defense at a later stage of this litigation, on a more developed factual record. Jordan v. Carter, 428 F.3d 67, 76 n.4 (1st Cir. 2005) ("[D]enial of immunity at the motion-to-dismiss stage does not preclude renewal of the defense in a subsequent motion for summary judgment or at trial.").

clearly established right.[16]  Id.  In other words, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id.

       1. Sergeant Cabán and John Doe

We have already explained that plaintiff's allegations establish the violation of a constitutional right.  We also conclude that forcing a prisoner to undergo an invasive abdominal surgery for the purpose of determining whether or not he is hiding a cell phone in his rectum is a violation of a clearly established constitutional right.  Over twenty years ago, we noted that it was the uniform view of the courts of appeals, including ours, "[t]hat inmates retained some fourth amendment protection from unreasonable searches of their persons."  Bonitz, 804 F.2d at 171 (collecting cases).  Around the same time, the Supreme Court stated in Winston that "[n]otwithstanding the existence of probable cause, a search

---

[16] Until recently, our circuit described the test as a three-pronged analysis, in which we "list[ed] separately the two sub-parts of the 'clearly established' prong along with the first prong and, as a result, [] articulated the qualified immunity test as a three-part test" that was nonetheless "faithful to the substance of the Court's two-part test . . . ."  Id. at 269.  In Maldonado, we announced that we would abandon our three-step articulation of the qualified immunity analysis in favor of the Supreme Court's two-step approach, which had recently been reiterated in Pearson v. Callahan, 129 S.Ct. 808, 815-16 (2009).  Id. at 269 (citing Wallace v. Reno, 194 F.3d 279, 283 (1st Cir. 1999) ("When a panel of this circuit has decided an issue, another panel will ordinarily not revisit that issue; but, of course, this limitation does not apply where an intervening decision of the Supreme Court overturns or undermines our earlier decision.")).

for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect." Winston 470 U.S. at 761. This surgery so endangered the plaintiff. As the district court noted, "[t]here can be no doubt that the surgery performed on Plaintiff posed a risk to his physical well being." Sanchez, 573 F. Supp. 2d at 486-87.

Moreover, because the surgery described in the complaint and its attendant circumstances were so outrageous, we comfortably conclude that a reasonable officer would understand that, under the particular facts of this case, the surgery violated plaintiff's clearly established right to be free from an unreasonable search. See Wolfish, 441 U.S. at 559. As we recognized in Bonitz, the legitimate penological objective of finding and removing contraband from the persons of inmates cannot justify every search of a prisoner in every situation. 804 F.2d at 172. Here, the surgery was conducted after the results of four tests had indicated the absence of contraband. A second x-ray, which plaintiff requested in lieu of the surgery, might well have resolved the question whether there was a cell phone in his rectum, and an x-ray taken subsequent to the surgery confirmed the absence of a cell phone. The surgery that was performed was no minor or routine procedure, such as a blood draw, but a highly invasive surgery that required full anesthesia and two days of recovery in the hospital. See Winston, 470 U.S. at 766 ("[T}he intrusion on respondent's privacy interests entailed by the operation can only be characterized as

-41-

severe."); Schmerber, 384 U.S. at 769-71 (noting the "fundamental human interests" implicated by "searches involving intrusions beyond the body's surface" but finding blood draw constitutional, in part, because it was "commonplace" and involved "virtually no risk, trauma, or pain"). The complaint does not disclose any exigent circumstances requiring the extreme measures taken here.

2. Dr. Deniz

We have already determined that Dr. Deniz qualifies as a state actor under the first prong of the qualified immunity analysis. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). We have also concluded, under the second prong of the test, that plaintiff's allegations establish the violation of a clearly established constitutional right. We now must determine whether, under the particular facts of this case, a reasonable physician would have understood that her behavior violated that right. Id. We conclude that Dr. Deniz's qualified immunity defense also fails at this stage.

In assessing whether Dr. Deniz may raise a defense of qualified immunity, we are guided by our analysis in Rodriques v. Furtado, 950 F.2d 805, 815 (1st Cir. 1991). In Rodriques, we recognized that "[i]t is a necessary though substantial imposition upon the physician to require him or her to learn the constitutional requirements of invasive body searches." Id. at 815. We concluded in that case that a doctor was entitled to a defense of qualified immunity after performing a body cavity search

-42-

of the appellant, a woman suspected of distributing narcotics. Id. at 807, 815. Police had obtained a warrant for the search, which directed that it be conducted by a physician at a local hospital. Id. at 808. After consulting with the hospital's acting president, the defendant, a doctor at the hospital, performed a "visual and manual inspection" of the appellant's vaginal cavity. Id. The appellant brought suit under 42 U.S.C. § 1983 alleging, in part, that the search conducted by the doctor was "unreasonable both on its face and in its method of execution." Id.

We found that the doctor was entitled to qualified immunity because he had conducted the search pursuant to an "objectively reasonable and facially valid warrant." Id. at 815. We explained, "[t]here is no duty imposed upon the physician to make inquiry of the officer regarding his basis for probable cause where [a] warrant is objectively facially valid." Id. We noted, however, that the mere existence of a warrant would not immunize a doctor from liability where a reasonable physician under the particular circumstances would realize that the warrant was facially deficient. Id. at 815 n.12.

Two major factors differentiate this case from Rodriques. First, the search described in the complaint was not performed pursuant to judicial authorization in the form of a warrant or judicial order. We explained in Rodriques that a physician's reliance on a judicial authorization "not only benefits society by effectuating acceptable means to execute body cavity searches

pursuant to a warrant issued on probable cause, it also benefits the party being searched by providing a safe means of conducting the search in a medically approved manner." Id. at 815. Such authorization by a judicial body is, in many instances, required before prisoners can receive even salutary medical treatment when that treatment is sought by the State rather than the inmate. See, e.g., Sell v. United States, 539 U.S. 166, 180 (2003) ("[A] court must find that important governmental interests are at stake" before a criminal defendant can be involuntarily treated with antipsychotic drugs.) (emphasis added).[17]

We see no benefit, however, to encouraging doctors to participate in the type of invasive and potentially dangerous surgery described in the complaint, performed only for a law enforcement purpose, and without a judicial authorization affirming

---

[17] See also, United States v. Williams, 356 F.3d 1045, 1053 (9th Cir. 2004) ("Both convicted prisoners and pretrial detainees 'possess[] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause.'"), and cases and regulation cited, supra, n.9. As is the case when prison officials seek to medicate inmates who suffer from dangerous or incapacitating mental illness, the medical procedure at issue here was conducted entirely at the behest of prison officials. Although plaintiff signed a consent form, that consent does not negate the Fourth Amendment issues raised by the surgery, as we explained earlier. See Vanvliet, 542 F.3d at 264 n.2, 264-65. We accept as true plaintiff's assertion in his complaint that he was intimidated by John Doe into signing the form and that he complied only after Dr. Deniz misrepresented the course of action she would take after he was sedated. According to the complaint, Dr. Deniz falsely assured plaintiff that before doing surgery, she would perform yet another rectal examination under anesthesia. Plaintiff did not, therefore, consent to the surgery as it was performed.

the necessity of such action. Rather, as we indicated in Rodriques, physicians asked to perform invasive body searches should not comply uncritically with the requests of prison officials and thereby become complicit in depriving prisoners of their constitutional rights.

Second, this case differs from Rodriques in that the surgery alleged in the complaint far exceeds the scope of the visual and manual examination conducted by the physician in that case. As we discussed above, a surgical invasion is far more intrusive than the already severe encroachment on a prisoner's bodily privacy occasioned by a manual body cavity search. See Winston, 470 U.S. at 757-59. That difference in scope also requires that the search at issue in this case be treated differently from the search in Rodriques.

In summary, a reasonable doctor should have understood that the surgery at issue here, performed at the insistence of the correctional authorities and not for plaintiff's benefit, violated plaintiff's Fourth Amendment right to be free of unreasonable searches and seizures. The invasive surgery described in the complaint -- conducted without the force of judicial authorization and for the sole purpose of extracting contraband that had resisted discovery in multiple rectal searches and two forced bowel movements -- fell beyond any objective test of reasonableness. On the facts alleged, we do not need to identify the precise level of familiarity with the Fourth Amendment fairly chargeable to a

-45-

physician acting as a state agent. No detailed knowledge of the law was required to understand that a physician should not perform invasive, non-medically required surgery on a prisoner in circumstances such as those described in the complaint. The conduct described in the complaint violated plaintiff's clearly established rights. A reasonable doctor would have understood as much.

## E. Supplemental Law Claims

Plaintiff's complaint also raised supplemental claims under Puerto Rico law, including claims under Article 1802 of Puerto Rico's Civil Code. P.R. Laws Ann. tit. 31 § 5141. The district court dismissed the state law claims in light of its dismissal of the federal law claims. See Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Because we have determined that it was error to dismiss some of plaintiff's federal claims against the correctional defendants and Dr. Deniz, we reinstate plaintiff's Puerto Rico law claims against those defendants. See 28 U.S.C. § 1367.

**IV.**

For the reasons set forth above, we vacate the dismissal of plaintiff's Fourth Amendment claims against Sergeant Cabán, John Doe and Dr. Deniz related to the exploratory surgery and the Puerto Rico law claims against those defendants. We affirm the dismissal of the Fourth Amendment claims against the administrative correctional defendants related to the exploratory surgery. We

-46-

also _affirm_ the dismissals of the Fourth Amendment claims related to the x-rays and the strip searches performed at the correctional institution; the dismissals of the Fourth Amendment claims related to the rectal examinations performed at the hospital; and the dismissal of plaintiff's Fifth, Eighth, and Fourteenth Amendment claims. Costs are awarded to appellant.

_So ordered._