NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0495n.06

**Case No. 14-6113**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FELIX CHARLES BOOKER, | ) | **FILED** |
|     Plaintiff-Appellee, | ) | Jul 10, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| MICHAEL LAPAGLIA, et al., | ) | UNITED STATES DISTRICT |
|     Defendants, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JERRY SHELTON, | ) | |
|     Defendant-Appellant. | ) | |

**O P I N I O N**

BEFORE: GUY, MOORE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** After pulling over Felix Charles Booker, police officers developed suspicions that Booker had narcotics lodged in his rectum. The officers transported him to the Anderson County Detention Facility, where they met Deputy Jerry Shelton, and then on to Methodist Medical Center. At the hospital, Dr. Michael LaPaglia performed a series of increasingly intrusive medical procedures in search of narcotics. The final search, which fruited a rock of cocaine, involved administering a combination of paralytic and sedative drugs and inserting a breathing tube.

Booker filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging, among other claims, that Shelton violated the Fourth Amendment. Shelton believes he is entitled to qualified immunity and appeals the district court's denial thereof. Because we conclude that the district court did not

conduct an individualized inquiry as to Shelton's role in the search, we **VACATE** the district court's denial of qualified immunity and **REMAND** with instructions for the district court to conduct an individualized inquiry as to Shelton's role in the search.

I.

The facts of this case are familiar as we do not consider this appeal with a clean slate. *See United States v. Booker*, 728 F.3d 535 (6th Cir. 2013) ("*Booker I*"). On the morning of February 12, 2010, Oak Ridge Police Officer Steakley pulled over a car. Booker was sitting in the passenger seat. During the stop, Steakley developed a suspicion that Booker was "attempting to conceal something" because of the way he was "moving around." *Id.* at 537. Upon the driver's consent to a search of the car, and drug dog Argo's positive alerts for drugs, Steakley discovered on the passenger floorboard small plastic bags with a white residue and something that looked like crushed marijuana. At that point, Steakley arrested Booker for possession of marijuana and placed him in the cruiser of another officer, Officer Lewis Ridenour.

Eventually, Booker was transported to the Anderson County Detention Facility. Upon arrival, Shelton, the Detention Facility officer on staff, performed a strip search because of suspicions that Booker had contraband hidden somewhere on or in his body. With no success, Shelton contacted his supervisor and the district attorney to decide how to proceed. Both told Shelton to take Booker to the hospital for further inspection. Neither Shelton nor any other officer sought or obtained a warrant to search Booker's body.

At the hospital, LaPaglia performed three rectal searches. LaPaglia's initial digital rectal search was not successful; Booker contracted his rectal muscles so that LaPaglia could not enter. LaPaglia then ordered a nurse to inject Booker with ten milligrams of Midazolam, a sedative and muscle relaxant, in order to conduct a second digital rectal examination. This time, LaPaglia felt

a foreign object, but LaPaglia could not remove it because Booker again contracted his rectal muscles. Finally, LaPaglia administered a combination of 20 milligrams of Etomidate, a sedative, and 125 milligrams of Succinylcholine, a paralytic agent. He inserted a breathing tube to keep Booker breathing. This search was successful and LaPaglia removed a white object from Booker's rectum.

A federal grand jury indicted Booker for one count of possession with intent to deliver more than five grams of cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Booker filed a motion to suppress the crack cocaine on the basis that the rectal searches violated the Fourth Amendment. Shelton testified for the government. The district court refused to suppress the evidence, and the case proceeded to trial. On February 2, 2011, a jury convicted Booker of the charge, and Booker appealed his conviction.

While the criminal case was pending, Booker filed a civil action in the Circuit Court for Anderson County, Tennessee, alleging various claims against Shelton, Steakley, and the others involved in the incidents, including claims for constitutional violations pursuant to 42 U.S.C. § 1983. The defendants removed the case to federal court pursuant to 28 U.S.C. §§ 1441, 1443. Before the conclusion of Booker's criminal case, the various defendants filed motions for summary judgment and motions to dismiss. Because the viability of many of Booker's civil-rights claims depended on the outcome of his criminal appeal in this court under *Heck v. Humphrey*, 512 U.S. 477 (1994), the district court stayed action on those claims while dismissing other claims.

Booker's appeal of his conviction was successful. On August 26, 2013, we reversed, holding that LaPaglia acted at the behest of law enforcement, thereby making his action state action, and that the search "shocked the conscience" and was "'unreasonable' for the purposes of

the Fourth Amendment." *Booker I*, 728 F.3d at 540, 542, 546. We accordingly held that the exclusionary rule was the proper remedy. The government did not retry Booker and dismissed the indictment.

On September 6, 2013, the district court dissolved the stay and ordered the parties to file dispositive motions without the benefit of discovery. Shelton and Steakley moved for summary judgment, arguing that they did not violate Booker's constitutional rights and were entitled to qualified immunity. The district court held that neither Steakley nor Shelton were entitled to qualified immunity. In a few short sentences, the district court addressed both defendants' qualified immunity arguments and concluded that there were material facts in dispute, that a reasonable jury could find that Shelton's actions violated Booker's Fourth Amendment rights, and that the right to be free from this body-cavity search was clearly established. Shelton filed this timely interlocutory appeal to contest the denial of qualified immunity with respect to his involvement with the rectal searches.

## II.

A denial of qualified immunity "is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291" "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Jurisdiction is not proper when the interlocutory appeal "solely contest[s] the plaintiff's account of the facts." *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 607 (6th Cir. 2015) (citing *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). To secure review of an appellate order denying qualified immunity, an officer "must be willing to concede the most favorable view of the facts to the plaintiff for the purposes of appeal." *Younes v. Pellerito*, 739 F.3d 885, 888 (6th Cir. 2014) (internal quotation marks and citation omitted). The only exception to this rule is when the evidence "utterly discredits" the plaintiff's version of events.

*Id.* at 889 (alteration omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Here, Shelton's appeal does not "solely contest" Booker's "account of the facts." *See Family Serv. Ass'n*, 783 F.3d at 607. Rather, Shelton contends that on the undisputed facts, he did not violate Booker's Fourth Amendment rights and even if he did, the law was not clearly established at the time of the search.

Qualified immunity protects Shelton from this lawsuit unless Booker can show that Shelton violated his constitutional rights and those rights were clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Family Serv. Ass'n*, 783 F.3d at 604. On appeal, we view the facts in the light most favorable to Booker and Shelton is entitled to summary judgment if no reasonable jury could find in Booker's favor. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We review de novo the denial of a motion for summary judgment based on qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

Shelton challenges the district court's ruling on three bases. First, he contends that he did not violate the Fourth Amendment because LaPaglia conducted the rectal searches, and LaPaglia was not a state actor. Second, Shelton argues that the search did not violate the Fourth Amendment because the search was reasonably related to the penological goal of preventing contraband from entering the Anderson County Detention Facility. Third, he asserts that, even if the rectal searches violated Booker's Fourth Amendment rights, the contours of the right were not clearly established on February 12, 2010.

A.

Shelton's first argument—that he is entitled to qualified immunity because LaPaglia was not a state actor—is foreclosed by *Booker I*. In that case, we held:

> LaPaglia must be treated as a government agent for Fourth Amendment purposes because the suspect was in the physical control of the police, the police knew what LaPaglia was going to do, the police knew that Booker did not consent, and a reasonable police officer would know that the doctor did not, independent of police direction, have the legal authority to intubate and paralyze the suspect without his consent.

*Booker I*, 728 F.3d at 541. We are bound by our prior published opinions unless the Supreme Court has intervened or we overrule the opinion en banc. 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc."); *see also Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 839–40 (6th Cir. 2010) (declining to consider arguments controlled by prior published opinions). Thus, Shelton's argument is unavailing; LaPaglia was a state actor, and we are left only with Shelton's second and third points: whether Shelton's involvement in LaPaglia's actions violated the Fourth Amendment and whether those rights were clearly established at the time of the search.

B.

Shelton contends that he enjoys qualified immunity because the rectal search was reasonable and necessary to prevent contraband from entering the detention facility, or, he argues in the alternative, that even if the search was unconstitutional, the law was not clearly established at the time of the violation. In evaluating a qualified immunity defense, it is well established that "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008)). This individualized analysis "must [] be done to ensure that a defendant's liability is assessed based on his own individual conduct and not the conduct of others." *Pollard*

*v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015). When the district court fails to conduct this analysis, this Court has the authority to "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson*, 515 U.S. at 319. In some cases, however, the better course is to remand "for the district court to set forth with precision the basis for its decision." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 571 (6th Cir. 2013) (citing *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)); *see also Wellness Int'l Network, Ltd. v. Sharif*, No. 13-935, 2015 WL 2456619, at *13 (U.S. May 26, 2015) (declining to conduct a "deeply factbound analysis of the [unique] procedural history" even though "it would be possible" to do so). In *Stoudemire*, this Court remanded a prisoner's § 1983 suit alleging deliberate indifference to medical needs for a more developed individualized inquiry with respect to one particular defendant. In doing so, the Court recognized that "[t]he district court did not mention any facts in the record that specifically pertained to [the defendant]." 705 F.3d at 570.

Similarly here, the district court ambiguously analyzed Shelton's qualified immunity defense. The court conflated both Shelton and Steakley's liability, analyzing the two defendants together and relying broadly and solely on this Court's opinion in *Booker I* to conclude that "the police cannot escape liability by using a third party to engage in acts the police are constitutionally prohibited from engaging in." *Booker v. LaPaglia*, No. 3:11-CV-126-PLR-CCS, 2014 WL 4259474, at *16 (E.D. Tenn. Aug. 28, 2014) (citing *Booker I*, 728 F.3d at 540–45). While this is an accurate statement of law, it does not negate the need for an individualized inquiry as to Shelton's involvement in the search. And it does not answer whether his conduct violated Booker's clearly established rights.

This record, the district court's brief qualified immunity analysis, and the dissent's factual summary indicate that it is still unclear exactly how Shelton participated in this search. This is significant because "[q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). Shelton claims and it is not disputed that his "only role was riding in the backseat of a police vehicle with Booker to the [hospital], staying at the hospital, and merely witnessing Dr. LaPaglia's care and treatment of Booker." Appellant's Br. at 41. He maintains that "[m]ultiple penological interests exist in determining what, if any, contraband [Booker] possessed prior to being booked into the facility." *Id.* at 39. We simply are unable to determine Shelton's specific role in the search and whether it is distinguishable from that of the other officers. Our precedent requires that role be addressed individually.

A remand here will result in the district court developing the factual record. Despite the dissent's contentions, Shelton's specific role in the search and his relationship to LaPaglia and the other officers involved in the hospital search cannot be determined on the present record. Despite the lack of record, the dissent improperly reads like an order granting summary judgment against Shelton in Booker's favor by focusing on various facts irrelevant to Shelton's liability, like events leading up to the hospital search not alleged to be constitutional violations. While the dissent suggests there is nothing to be gained from a remand, such factual development of the record may very well entitle Shelton to qualified immunity. At the very least, he will have been heard on that issue. But as it stands now, we cannot distinguish between Shelton's involvement and that of the other officers as is required by our precedent. *See Binay*, 601 F.3d at 650. We therefore vacate and remand for the district court to address Shelton's role in the search and to properly evaluate his qualified immunity defense.

This approach is consistent with the general principle that district courts decide issues like qualified immunity in the first instance. As we have recognized, "[w]e are at a disadvantage, generally, when we address on appeal an issue that was so tersely presented to the district court." *Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002). This is especially true in the qualified immunity context. "District courts are far more familiar with the factual record in their cases than are the courts of appeals, and this knowledge can generate useful insights into the issues surrounding qualified immunity." *Id.* And officers should not have to go through the "burdens of litigation" to only find out later that immunity should have been granted. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell*, 472 U.S. at 526).

## VI. CONCLUSION

We **VACATE** the district court's denial of qualified immunity and **REMAND** for further proceedings.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority takes the indefensible position that it is too difficult or cumbersome to review the district court's order denying Defendant-Appellant Jerry Shelton qualified immunity. This conclusion is untenable because we are perfectly capable of evaluating the legal arguments presented from the mostly undisputed and limited record we have before us.[1] Moreover, Shelton—the presumptive beneficiary of a more individualized analysis—has never requested that this court or any other court expand the analysis. He did not make such a request in his appellate brief, nor did he file a motion for reconsideration with the district court. Indeed, Shelton has been the driving force behind consideration of his eligibility for qualified immunity on this record: Shelton has now filed *two* motions for summary judgment and *two* appeals to this court *based on this record.*

---

[1]There are very few documents that we must examine in order to evaluate Shelton's appeal. In support of his motion for summary judgment, Shelton submitted seven exhibits: (1) Booker's criminal indictment; (2) the transcript of the suppression hearing from *United States v. Booker* (*Booker I*), 728 F.3d 535 (6th Cir. 2013); (3) the *Booker I* magistrate judge's report and recommendation regarding Booker's suppression motion; (4) the *Booker I* district court memorandum adopting the report and recommendation; (5) the jury verdict from *Booker I*; (6) the Sixth Circuit's published opinion in *Booker I*; and (7) an order from the U.S. District Court for the Eastern District of Tennessee in *East Ridge Flea Market, LLC v. City of East Ridge, Tennessee*. *See* R. 172-1–172-7 (Exs. to Shelton's Mot. for Summ. J.) (Page ID #3187–49). Only the transcript of the suppression hearing is relevant to understand the factual basis of Booker's claims. Booker's response to Shelton's motion for summary judgment relied on the same transcript of the suppression hearing, and Booker filed two affidavits. *See* R. 106 at 1–3 (Booker Aff.) (Page ID #2018–20); R. 171 at 1–2 (2d Booker Aff.) (Page ID #3182–83); R. 236 at 1–6 (Pl.'s Resp. to Shelton's Mot. for Summ. J.) (Page ID #4224–29).

Booker also filed a motion for summary judgment, citing the transcript and his statement of undisputed facts, which Shelton admitted for the purposes of summary judgment. *See* R. 154 at 1–6 (Pl.'s Mot. for Summ. J.) (Page ID #3004–09); R. 214 at 1–5 (Shelton's Resp. to Pl.'s Statement of Undisputed Facts) (Page ID #3971–75). In response to Booker's summary-judgment motion, Shelton cited the suppression hearing transcript, Richard Parker's affidavit, and his own affidavit. *See* R. 212–212-3 (Shelton Resp. to Mot. for Summ. J.) (Page ID #3760–3937).

In sum, to consider the factual basis of Booker's claim, we need to look at only (1) the transcript of the suppression hearing at which Shelton and Booker testified; (2) Shelton's affidavit; (3) Parker's affidavit; (4) Booker's affidavit; (5) Booker's second affidavit; and (6) Shelton's responses to Booker's statement of undisputed facts. That is all.

Shelton believes that this record establishes that he is entitled to qualified immunity and that the district court was wrong to deny him qualified immunity. The majority unnecessarily delays the inevitable conclusion I believe this record compels: Shelton is not entitled to qualified immunity. This appeal is ripe for adjudication because there is nothing more for the district court to do; the record will not change, and neither will the law as of February 12, 2010.

## I. FACTS[2]

Because the majority tellingly omits discussion of the evidence of Shelton's role in the search, including Shelton's description that he gave during the suppression hearing, I provide the facts now.

When Officer Lewis Ridenour and Plaintiff-Appellee Felix Booker arrived at the Anderson County Detention Facility, Ridenour asked Shelton to perform a strip search because Ridenour believed that Booker had contraband hidden somewhere on or in his body. R. 144-3 at 86, 106–07, 115, 117–18 (Tr. Suppression Hr'g) (Page ID #2721, 2741–42, 2750, 2752–53). Shelton admitted that he probably would not have conducted the strip search if Officer Ridenour had not asked him to do it. *Id.* at 117–18 (Page ID #2752–53). Shelton and another correctional officer performed the strip search, taking off and shaking each piece of Booker's clothing one at a time. *Id.* at 107–08 (Page ID #2742–43). Next, Shelton examined Booker's naked body, asked him to lift up his genitals, and to bend over and spread his buttocks. When Booker was bending over, Shelton says that he saw "a small string protruding from [Booker's] anus."[3] *Id.* at 107–09 (Page ID #2744). Shelton asked Booker about the string, and Booker moved his hand towards

---

[2]The parties conducted very little discovery before Shelton and Steakley filed motions for summary judgment.

[3]Booker denies that there was a "white string" in his anus, R. 171 at 2 (2d Booker Aff. ¶ 4) (Page ID #3183), and the officers never found a string in Booker's rectum. R. 144-3 at 116 (Tr. Suppression Hr'g) (Page ID #2751).

his buttocks. *Id.* at 110 (Page ID #2745). Shelton and other correctional officers swarmed Booker, grabbed his arms, and lowered him to the floor. One officer sprayed mace on Booker. *Id.* at 110, 116, 161 (Page ID #2751, 2796).

After the officers had subdued Booker, they strapped him to a chair for fifteen to twenty minutes without any clothes, while Shelton contacted his supervisor and the district attorney to decide how to proceed. *Id.* at 111–12, 161 (Page ID #2746–47, 2796). Both told Shelton to take Booker to the hospital for further inspection. *Id.* Neither Shelton nor any other officer sought or obtained a warrant to search Booker's body. *Id.* at 98, 120 (Page ID #2733, 2755).

In the police cruiser, on the way to the hospital, Booker was clothed in nothing but shackles and a blanket covering his shoulders. *Id.* at 113 (Page ID #2748). Shelton did not activate the emergency lights or turn on the sirens. *Id.* at 119 (Page ID #2754). While Shelton was transporting Booker, Ridenour contacted the arresting police officer, Daniel Steakley, to inform him of what had happened at the Detention Facility. *Id.* at 88–89 (Page ID #2723–24).

At the hospital, Steakley told Dr. Michael LaPaglia that Steakley "strongly suspected" that Booker had narcotics in his rectum. *Id.* at 127, 135–36 (Page ID #2762, 2770–71). Shelton testified that Booker was not feverish or sweating; Booker responded to questions normally and did not appear to be intoxicated. *Id.* at 118 (Page ID #2753). LaPaglia also observed that Booker had normal vital signs. *Id.* at 128, 136–37 (Page ID #2763, 2771–72). Booker remained shackled, handcuffed, and naked as LaPaglia performed his examination, while Shelton and the other officers watched. *Id.* at 139 (Page ID #2774).

Next, LaPaglia visually inspected Booker's body. He did not see a string or any objects protruding from Booker's anus, but LaPaglia decided to proceed with a digital rectal examination anyway. *Id.* at 138 (Page ID #2773). When LaPaglia explained to Booker that he intended to

conduct a digital rectal examination, Booker responded that he did not have anything in his rectum and did not consent to the digital rectal search. *Id.* at 129, 162 (Page ID #2764, 2797).[4] Shelton was present during this digital rectal exam and heard Booker refuse consent to the search. *Id.* at 120–23 (Page ID #2756–58).

LaPaglia's initial digital rectal search was not successful; Booker contracted his rectal muscles so that LaPaglia could not insert his fingers into Booker's rectum. *Id.* at 130 (Page ID #1765). Undeterred and without Booker's consent, LaPaglia ordered a nurse to inject Booker with ten milligrams of Midazolam, a sedative and muscle relaxant, in order to conduct a second digital rectal examination. *Id.* After the nurse inserted a needle with the Midazolam into Booker's left buttock, LaPaglia proceeded with the second anal probe and felt a foreign object. *Id.* at 131, 139 (Page ID #2766, 2774). Booker remained handcuffed during the injection and anal probing. *Id.* at 123 (Page ID #2758). LaPaglia could not remove the object because Booker contracted his rectal muscles again. *Id.* at 131 (Page ID #2766). Shelton watched the nurse administer the shot, Shelton watched LaPaglia probe Booker's anus, and Shelton heard Booker refuse consent to the injection and search. *Id.* at 122–23 (Page ID #2757–58).

Still undeterred, LaPaglia administered a combination of twenty milligrams of Etomidate, a sedative, and 125 milligrams of Succinylcholine, a paralytic agent. *Id.* at 142 (Page ID #2777). "At that point, [LaPaglia] had to place a tube into [Booker's] lungs to keep him alive." *Id.* at 142 (Page ID #2777); *see also id.* at 131 (Page ID #2766). Four officers held Booker down on the table while the nurse administered the injection and LaPaglia conducted the intubation. *Id.* at 162–63 (Page ID #2797–98). Shelton was one of the officers in the room, and Shelton watched LaPaglia inject the paralytic and general anesthesia and conduct a third rectal search. *Id.* at 123–

---

[4]LaPaglia initially testified that Booker eventually gave consent to conduct the rectal examination—a claim Booker disputes. R. 144-3 at 130, 162 (Page ID #2765, 2797).

25 (Page ID #2758–60). LaPaglia removed a white object from Booker's rectum and relinquished it to Steakley immediately. *Id.* at 132 (Page ID #2767).

Booker was not the first Anderson County Detention Facility inmate on whom LaPaglia had performed this type of rectal search. Anderson County, Shelton's employer, had asked LaPaglia to perform a rectal search on two other detainees before the rectal search of Booker. *Id.* at 145 (Page ID #2780).

## II. ANALYSIS

### A. Qualified Immunity

Booker contends that Shelton "acted in concert with [Officers Ridenour and Steakley] in authorizing . . . LaPaglia to perform a warrantless, non-consensual body cavity search while [Booker] was in [Shelton's] custody." R. 248 at 6 (Pl.'s Reply to Resp. to 1st Mot. for Summ. J.) (Page ID #4307). Shelton argues that he did not violate the Fourth Amendment because the rectal searches were reasonable measures to prevent contraband from entering the Anderson County Detention Facility and to protect Booker from a possible drug overdose. In addition, Shelton asserts that, even if the rectal searches violated Booker's Fourth Amendment rights, the contours of the right were not clearly established on February 12, 2010.

#### 1. The Right to be Free of Warrantless Rectal Examinations

Although Shelton did not perform the anal probes, inject the paralytic agent, anesthetize or intubate Booker, Shelton is liable for LaPaglia's actions if he observed unconstitutional conduct, had the means and opportunity to prevent the unconstitutional conduct, and did nothing to stop it. *Durham v. Nu'Man*, 97 F.3d 862, 866–67 (6th Cir. 1996); *see also McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990). Accordingly, if investigative or penological

interests did not justify LaPaglia's conduct, and Shelton either participated in the search or had the opportunity to prevent the search, then Shelton violated the Fourth Amendment.

The Supreme Court has given correctional officers latitude "to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1517 (2012); *see also Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 573–74 (6th Cir. 2013) (applying the principles of *Florence* to an individual search, not just review of prison regulations). But "regulation[s] impinging on an inmate's constitutional rights" must be "reasonably related to legitimate penological interests." *Florence*, 132 S. Ct. at 1515 (internal quotation marks omitted) (emphasis added). Even though prison officials enjoy broad latitude to prevent contraband from entering the facility, Shelton is still not entitled to qualified immunity because this record demonstrates that this warrantless rectal search violated the Fourth Amendment.

Correctional officers' discretion to conduct penological searches has limits. We must "take cognizance of the valid constitutional claims of prison inmates," *Stoudemire*, 705 F.3d at 571–74 (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)), and balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). That balancing requires consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

I first address the scope, manner, and location of the search. *Stoudemire*, 705 F.3d at 572. The Supreme Court has described a person's interest in his own bodily integrity as the "most personal and deep-rooted expectations of privacy"—the very interests the Fourth Amendment protects. *Winston v. Lee*, 470 U.S. 753, 760 (1985). Accordingly, there is a

separate analysis that we undertake to assess the reasonableness of bodily intrusions; we consider:

> (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." The failure to obtain a warrant, while not necessarily fatal to a claim of reasonableness, is also relevant.

*George v. Edholm*, 752 F.3d 1206, 1217 (9th Cir. 2014) (quoting *Winston*, 470 U.S. at 761–62). The final step in the *Winston* analysis is inapplicable in the context of a search for penological goals, and therefore we consider the detention facility's need for the search instead. *See Bell*, 441 U.S. at 559.

A reasonable jury could conclude that this search involved risk to Booker's health and safety. LaPaglia injected a combination of drugs to anesthetize and paralyze Booker. R. 144-3 at 131 (Tr. Suppression Hr'g) (Page ID #2766). In order to keep Booker alive, LaPaglia inserted a tube down Booker's throat and into his lungs. *Id.* at 131, 142 (Page ID #2766, 2777). Booker testified that, when he regained consciousness, the tube caused him great discomfort. *Id.* at 163 (Page ID #2798). We must resolve in Booker's favor any dispute about whether the procedures LaPaglia performed were risky. *Winston*, 470 U.S. at 766. Even so, the record establishes that the combination of drugs posed a risk to Booker's life and health, and the intubation—although performed to keep Booker alive—caused him pain. The record is silent with respect to the health and safety risks of anal probing.

The health and safety risks of this search were far greater than or, at a minimum similar to, the risks posed by other unconstitutional bodily searches. In *Rochin v. California*, the Supreme Court held that "forc[ing] an emetic solution thorough a tube into [a suspect's] stomach against his will" in order to induce vomiting violates Due Process and "shocks the conscience."

342 U.S. 165, 166, 172 (1952). Moreover, anal probing, intubating, paralyzing, and anesthetizing are significantly less routine and more intrusive than a "common place" blood test. *See Schmerber v. California*, 384 U.S. 757, 771 (1966). And, even when doctors take all reasonable medical precautions, "we do not want to underestimate the seriousness of any medical procedure that renders a person unconscious." *United States v. Husband*, 226 F.3d 626, 631 (7th Cir. 2000). Thus, there is sufficient evidence from which a reasonable jury could conclude that the procedure LaPaglia performed endangered Booker's life and health.

The next step in the analysis is to consider how the search affected Booker's dignity interests. I have no trouble concluding that a reasonable jury could decide that this search impinged Booker's interest in his bodily integrity and dignity. Shelton transported Booker to the hospital, where LaPaglia probed Booker's anus in Shelton's presence and with Shelton's assistance. After Shelton conducted the visual strip search, he and others made the decision to drive Booker to the hospital, and material questions of fact remain about whether Shelton's role in the transportation to the hospital and subsequent rectal search was reasonable. After the visual strip search, Shelton humiliated Booker. Before taking Booker to the hospital, Shelton left Booker shackled to a chair without any clothing for fifteen to twenty minutes. R. 144-3 at 161 (Tr. Suppression Hr'g) (Page ID #2796). Booker's naked body and genitals were exposed to the public except for the blanket on his shoulders during the ride to the hospital in the police cruiser. *Id.* at 162 (Page ID #2797).

At the hospital, Shelton presented Booker to LaPaglia, and Shelton assisted and watched as LaPaglia conducted a degrading and brutal search. Anal probing is obviously more invasive than a visual strip search, and even a visual strip search is a practice that "instinctively gives us . . . pause," *Bell*, 441 U.S. at 558, and "is undoubtedly humiliating and deeply offensive to

many," *Florence*, 132 S. Ct. at 1524 (Alito, J., concurring). LaPaglia "targeted an area of the body that is highly personal and private." *United States v. Gray*, 669 F.3d 556, 564 (5th Cir. 2012), *abrogated on other grounds by Gray v. United States*, 133 S. Ct. 151 (2012). LaPaglia inserted his fingers into Booker's rectum three times against Booker's will and without consent or a warrant. Each time LaPaglia tried to enter Booker's anus, Booker squeezed his muscles tightly so that LaPaglia could not probe, making it known that Booker did not acquiesce to the procedure. R. 144-3 at 130, 140 (Tr. Suppression Hr'g) (Page ID #2765, 2775). Shelton heard Booker object to the procedures multiple times. *Id.* at 122 (Page ID #2757). The nurse twice inserted needles into Booker in order to sedate and paralyze him, thereby taking away Booker's ability to control his body or to give consent for the procedure. *Id.* at 139, 141 (Page ID #2774, 2776). Indeed, Shelton may have physically restrained Booker during the second injection before LaPaglia forced tubing down Booker's throat and into his lungs prior to once again inserting his fingers into Booker's rectum. *Id.* at 142, 162–63 (Page ID #2777, 2797–98). Each one of these actions was degrading.

Booker experienced a categorically greater affront to personal dignity than Rochin or Winston. Like Booker, Rochin had to endure having a doctor force a tube down his throat against his will. *Rochin*, 342 U.S. at 166. Winston and Booker both suffered the indignity of being "total[ly] divest[ed] of [their] ordinary control over surgical probing beneath the skin" because of the forced anesthesia. *Winston*, 470 U.S. at 765. Moreover, LaPaglia and Shelton physically contacted Booker's naked body—a practice we have recognized causes "deep[] injury to personal dignity and individual privacy." *Williams v. City of Cleveland*, 771 F.3d 945, 952–53 (6th Cir. 2014). And Booker suffered all of these indignities and more.

The final step is to consider the correctional facility's need to conduct this search and whether, on balance, the search was reasonably tailored to achieve the penological goals of the search. *Stoudemire*, 705 F.3d at 572. Shelton argues that he and other detention officers had to search Booker's rectum because they had a strong suspicion that he was hiding drugs in his anus. Appellant Br. at 40. Moreover, Shelton contends that the search was reasonable because Booker could have been concealing "prescription medications, cigarettes, alcohol, guns, knives, razors, [or] other objects which may be used as weapons . . . ." *Id.* Preventing contraband from entering a detention facility is undoubtedly a legitimate penological goal. *See Florence*, 132 S. Ct. at 1518–20.

Those ends do not justify all means, however. The Supreme Court has said that even when officers conducting an investigative search have reasonable suspicion or even probable cause, they may not use all means to uncover evidence. In *Rochin*, the police officers watched a suspected drug dealer swallow two morphine capsules. 342 U.S. at 166. And even though they knew that the capsules were in Rochin's stomach and had a reasonable suspicion to believe they were morphine capsules, the officers could not request that a doctor insert a tube into the man's stomach and induce him to vomit. *Id.* at 172. Similarly, in *Winston*, the officers had probable cause to believe that the bullet tying an armed-robbery suspect to the crime was lodged in the suspect's left collarbone, *see* 470 U.S. at 756, and court approval to conduct a surgery to remove the bullet, *id.* at 757, and yet, the Supreme Court still held that forced surgery was far too intrusive to justify the officers' search for evidence. *Id.* at 767.

Those same principles apply when the interests involved are penological. "[A] correctional institution will have little need to conduct the search or seizure in a particular manner if there are 'obvious, easy alternatives that fully accommodate the prisoner's rights at *de*

*minimis* cost' to the institution's valid penological interest underlying the search in the first place." *Williams*, 771 F.3d at 954 (quoting *Turner,* 482 U.S. at 90–91) (internal alterations omitted).

Shelton and the other officers had many more reasonable ways to prevent Booker from secretly bringing contraband into the facility. LaPaglia could have taken an x-ray of Booker's rectum in order to learn whether there was something lodged in it. R. 144-3 at 138–39 (Tr. Suppression Hr'g) (Page ID #2773–74). It was possible to monitor Booker for signs of intoxication and wait for him to have a bowel movement. Laxatives may have also been an effective, less-intrusive mechanism to uncover whatever Booker had in his rectum. And, perhaps most significantly, the officers could have sought a warrant.[5] Over four hours passed between the time Steakley first observed Booker purportedly fidgeting in the car and the intubation, so surely the officers had the opportunity to seek a warrant. *See United States v. Booker ("Booker I)*, 728 F.3d 535, 537, 539 (6th Cir. 2013); *see also George*, 752 F.3d at 1220 (finding that, had doctors administered laxatives and monitored the detainee's bowel movements, then the officers would have had time to seek a warrant for a rectal search). To the officers' credit, at least they did not try to search Booker's rectum without the assistance of medical personnel. *See United States v. Fowlkes*, 770 F.3d 748, 761 (9th Cir. 2014) ("[I]t would have been more reasonable simply to comply with the jail's written policy and summon medical personnel."). But that a doctor performed this humiliating search in a hospital does not make this search reasonable. With these alternatives readily available, Shelton's concern about contraband did not outweigh Booker's right to privacy and bodily integrity.

---

[5]I express no view on whether a court could issue a warrant for this procedure.

When the record is viewed in the light most favorable to Booker, this search violated the Fourth Amendment. A reasonable jury could find that Shelton caused, watched, and was complicit in the unconstitutional searches, and therefore violated the Fourth Amendment. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) ("[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.").

That is not to say that Booker is entitled to judgment as a matter of law, however, as the majority contends. Maj. Op. at 8. Booker does not request that we enter judgment in his favor, and therefore it would be entirely improper to impose a remedy that has never been requested. And we do not and could not have jurisdiction to hear an appeal of the district court's denial of Booker's motion for summary judgment. Booker could not appeal the denial of his motion for summary judgment because it is not a final, appealable order. *See* 28 U.S.C. § 1291 (2012); *Mitchell v. Forsyth*, 472 U.S. 511, 526–30 (1985) (noting that a denial of qualified immunity decides only whether an official is immune from standing trial under the plaintiff's version of the facts; not whether the official defendant is, in fact, liable); *Bomar v. City of Pontiac*, 643 F.3d 458, 461 (6th Cir. 2011) ("In general, denials of summary judgment are not appealable final orders."). I conclude only that Booker has presented facts that constitute a violation of the Fourth Amendment if found by a jury—nothing more, nothing less.

**2. Clearly Established Law**

Even if a government official commits a constitutional violation, he is immune from suit if "the right was [not] clearly established at the time of the alleged violation." *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). A constitutional right is clearly established if

"existing precedent . . . ha[s] placed the statutory or constitutional question beyond debate." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). "'[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.'" *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Thus, we must decide whether it was clearly established on February 12, 2010, that penological concerns did not justify anesthetizing, paralyzing, and intubating Booker in order to uncover narcotics from his rectum.

Shelton argues that it was not clearly established that LaPaglia was acting as a state agent or that the three rectal searches were unreasonable. Shelton does not address that we have already held that "no reasonable police officer," in Shelton's position, "could believe that, without direction from the police, and over the clear refusal to consent by a conscious and competent patient, a doctor could lawfully go ahead and perform such a procedure." *Booker I*, 728 F.3d at 542. We also held that, on February 12, 2010, under these circumstances, "a reasonably well-trained officer and physician would have known that the search was unlawful."[6] *Id.* at 548. Thus, in my view, we are bound by our precedent, and we must conclude that the law was clearly established on both points.[7]

---

[6]Although we decided *Booker I* in 2013, we based our conclusion that no reasonable officer would believe this search was constitutional on long-established principles set forth in *Rochin* and *Winston*. *See Booker I*, 728 F.3d at 545–48.

[7]Shelton's extensive reliance on the magistrate judge's and district court's holdings that the search was constitutional is unavailing because we held in a binding opinion that no reasonable officer could think the search was constitutional, and we are bound by that precedent. Moreover, Shelton's reference to the *Booker I* dissenting opinion is similarly unavailing because the dissent did not actually conclude that the search was reasonable. *See Booker I*, 728 F.3d at 549–50.

Even if we were not bound by *Booker I*, however, I would have no trouble finding that the law was clearly established in February 2010 that an officer cannot use private parties to conduct illegal searches. *See, e.g.*, *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989) ("Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government."); *George*, 752 F.3d at 1220 (holding that, on March 13, 2004, it was clearly established that the Fourth Amendment protects people from medical procedures induced by law-enforcement officers); *Ellis v. City of San Diego*, 176 F.3d 1183, 1191–92 (9th Cir. 1999) (denying qualified immunity to nurses and doctors who administered tranquilizers, took blood tests, and inserted a catheter into the plaintiff's penis).

I also believe that it was clearly established that this search was far more invasive than other searches the Supreme Court and other circuits have found unconstitutional. The Supreme Court has declared that forcible surgery and induced vomiting are unreasonable investigative searches. *Winston*, 470 U.S. at 767; *Rochin*, 342 U.S. at 172. I do not have to strain to conclude that penological goals do not justify anesthetizing, paralyzing, intubating, and anally probing someone if induced vomiting is "too close to the rack and screw to permit constitutional differentiation." *Rochin*, 342 U.S. at 172. Both *Rochin* and *Winston* significantly predate this search.

Opinions from circuit courts also notified Shelton that this search was unconstitutional. In 1976, then-Judge Kennedy held that twice forcing a person who had crossed the border to submit to digital probes and enemas and forcing that person to drink a liquid laxative violated the Fourth Amendment. *United States v. Cameron,* 538 F.2d 254, 258 (9th Cir. 1976). In 1999, the

Ninth Circuit denied qualified immunity after concluding that, as of September 1995, the rights of a parolee to be free from physical restraint, forced drugging, nonconsensual catheterization, and forcible blood and urine extraction were clearly established. *Ellis*, 176 F.3d at 1191–92. In the few cases where courts have held that body-cavity searches did not violate the Fourth Amendment, the officers had obtained warrants. In *Husband*, the Seventh Circuit had doubts about the reasonableness of a search of a suspect's mouth after forced injection of a general anesthetic even though the officers had obtained a warrant to search the suspect's body and the suspect exhibited signs of a drug overdose. 226 F.3d at 631–36. The First Circuit, in 1991, held that the right to be free from a visual and physical vaginal search by a physician, pursuant to a warrant was not clearly established. *Rodriques v. Furtado*, 950 F.2d 805, 811 (1st Cir. 1991). In both *Husband* and *Rodriques*, however, our sister circuits expressed great concern about the "drastic and total intrusion of the personal privacy and security values" caused by a vaginal search, *Rodriques*, 950 F.3d at 811, and the "serious invasion of . . . personal privacy and liberty interests" posed by forced sedation and oral cavity searches, *Husband*, 226 F.3d at 632. In the only case that held that warrantless digital rectal probing by a doctor did not violate the Fourth Amendment, there was no dispute about whether the purpose of the search was penological or abusive. *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44 (1st Cir. 2009). But that is not the case here; Booker has alleged that the purpose of the search was investigative and that Shelton and the other officers humiliated him in the process. Thus, each of these circuit precedents provided Shelton with sufficient notice that the warrantless search of Booker was unconstitutional.

Finally, our holding that, on February 12, 2010, the right to be free from forced anesthetization, paralyzation, intubation, and warrantless rectal examinations to prevent a suspect from overdosing on drugs lodged in his rectum was clearly established is consistent with the

Ninth Circuit. In *George v. Edholm*, the Ninth Circuit concluded that a warrantless digital rectal examination and forced sedation and intubation violated the Fourth Amendment. *See* 752 F.3d at 1217–20. Not only was it a constitutional violation, but the right to be free of that procedure had been clearly established long before March 13, 2004. I see no reason to create a circuit split, and therefore would hold that no reasonable officer would believe that this search was reasonable under the circumstances apparent in this record.

## B.  The Need for Remand

The foregoing analysis demonstrates that an individualized analysis is not too cumbersome or difficult in this case. True, the district court analyzed Shelton's and Steakley's liability together, but there was a good reason for that: Steakley's and Shelton's roles in the search at the hospital were very similar. Both Steakley and Shelton remained in the room when LaPaglia anesthetized, paralyzed, intubated, and searched Booker. R. 144-3 at 26–27, 62 (Tr. Suppression Hr'g) (Page ID #2661–62, 2697) (Steakley's testimony); *Id.* at 122–25 (Page ID #2757–60) (Shelton's testimony). Both Steakley and Shelton heard Booker refuse to consent to the procedure. R. 144-3 at 61 (Tr. Suppression Hr'g) (Page ID #2696) (Steakley's testimony); *Id.* at 122 (Page ID #2757) (Shelton's testimony). And neither Steakley nor Shelton tried to obtain a search warrant. R. 144-3 at 61 (Tr. Suppression Hr'g) (Page ID #2696) (Steakley's testimony); *id.* at 120 (Page ID #2755) (Shelton's testimony). Finally, Booker testified that "[t]hree or four officers, including Officer Ridenour, Officer Steakley and the two sheriffs held [him] down," while LaPaglia administered a shot to his leg, *id.* at 162–63 (Page ID #2797–98), and thus a reasonable jury could conclude that both Steakley and Shelton physically restrained Booker while the nurse anesthetized him. Perhaps the only notable difference between Steakley's and Shelton's conduct at the hospital is that Booker was in Shelton's custody when

they arrived at the hospital and remained in Shelton's custody and control after the rectal probing, *see id.* at 119–25 (Page ID #2754–60), potentially making Shelton more culpable for what happened to Booker. Thus, Shelton and Steakley are liable to the same degree for LaPaglia's conduct, and further analysis is unnecessary.

The majority's reliance on *Stoudemire* is misplaced. In *Stoudemire*, a correctional officer appealed the denial of qualified immunity for an Eighth Amendment deliberate-indifference claim. *See* 705 F.3d at 570–71. To prevail on a deliberate-indifference claim, a plaintiff must establish both objective and subjective elements: (1) that the defendant was aware of facts that lead to the inference "that a substantial risk of serious harm existed," and (2) that the defendant actually drew the inference that there was a substantial risk of harm. *Id.* at 570 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal brackets omitted). In *Stoudemire*, "[t]he district court did not mention any facts in the record that specifically pertained to [the appellant-defendant], nor did the court make any findings regarding [the appellant-defendant's] *knowledge or mental state*." *Id.* (emphasis added). We did not have any basis to review the district court's determination whether a reasonable jury could find that the defendant was actually aware of the substantial risk of harm to the plaintiff. Accordingly, a remand for a more individualized analysis was certainly appropriate.

Similarly, in *Poe v. Haydon*, we remanded the case for a more individualized analysis because the district court had not analyzed the defendants' motivations—a necessary component of finding that an official has engaged in purposeful discrimination. 853 F.2d 418, 426, 430 (6th Cir. 1988). And the district court had denied the defendants' motion for summary judgment with a minute order without even reading the defendants' deposition testimony. *Id.* at 426. A remand

was certainly appropriate to assess the defendants' subjective intents and to require that the district court actually review the record.

Here, we do not need to assess Shelton's subjective intent; our analysis must focus exclusively on the facts of the search of which Shelton was *objectively* aware. When the plaintiff alleges that a search or seizure was unreasonable in violation of the Fourth Amendment, the Supreme Court "ha[s] repeatedly rejected" any inquiry into an officer's subjective intent. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). The question we must answer is limited to whether Shelton's conduct was "'reasonable' under the Fourth Amendment, regardless of [his] state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (internal brackets omitted). Steakley and Shelton were aware of the same facts, which a reasonable jury could conclude objectively lead to the conclusion that penological concerns did not justify the manner of this search. Moreover, nothing in this record suggests that the district court ignored the evidence that the parties presented in the motions for summary judgment as my colleagues do now.

*Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015), cited by the majority, does not justify the majority's position. In *Wellness*, the Supreme Court addressed whether a party to a bankruptcy proceeding can waive "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter." *Id.* at 1941–42 (internal quotation marks omitted). The Supreme Court held that parties to a bankruptcy action can consent to adjudication of "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty" in a non-Article III court and thereby waive the right to argue that adjudication of that claim violates the separation-of-powers doctrine. *Id.* at 1938, 1947. The Court did not engage in the "deeply

factbound analysis" required to determine whether the plaintiff had knowingly and voluntarily consented to adjudication by a non-Article III judge because the *Supreme Court* is "'a court of review, not of first view.'" *Id.* at 1949 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. ---, 134 S. Ct. 2120, 2131 (2014)). The Court said absolutely nothing about our ability to review factbound questions that are properly presented to us.

The unfortunate consequence of the majority's approach is that Shelton must now wait for yet another opinion about whether he is entitled to qualified immunity—a determination by the district court that I have no doubt he will appeal—and Booker must unnecessarily wait to present his case to a jury. Shelton has never asked for this result, nor does it appear that he would want a remand. He would like this court to decide definitively whether he is entitled to qualified immunity. Within five months of removing this case to federal court, Shelton filed his first motion for summary judgment. R. 32 at 1–3 (Shelton's Mot for Summ. J.) (Page ID #446–48). When the district court denied Shelton's motion for summary judgment without prejudice and stayed the proceedings until the resolution of Booker's criminal appeal, R. 97 at 7–8 (D. Ct. Order & Mem. Decision) (Page ID #1930–31), Shelton appealed that decision. R. 105 at 1–2 (Notice of Appeal) (Page ID #2016–17). We dismissed his appeal for lack of jurisdiction because the district court's order was not a final appealable order. R. 113 at 3–4 (6th Cir. Order) (Page ID #2077–78). After we issued our opinion in *Booker I* and the district court dissolved the stay, R. 134 at 1–2 (Scheduling Order) (Page ID #2243–44), Shelton renewed his motion for summary judgment. *See* R. 172 at 1–3 (Shelton Mot. for Summ. J.) (Page ID #3184–86). Without filing a motion for reconsideration and requesting a more individualized analysis, Shelton appealed, asking this court to address whether this record entitles him to qualified

immunity. The majority punts on that question. I believe Shelton is not entitled to qualified immunity and that it is time for a jury to hear this case.